HARTWELL LOVEJOY *vs.* INHABITANTS OF FOXCROFT.

DAVID GRIFFITH, Executor, *vs.* SAME.

HENRY A. DUNHAM *vs.* SAME.

SUSIE E. GOULD *vs.* SAME.

ANNIE B. EMERSON *vs.* SAME.

Piscataquis.    Opinion February 24, 1898.

*Towns. Power to borrow money. Debts. Evidence. Burden of Proof. Treasurer. Const. Limit. Art. XXII, Const. of Maine.*

1. In the absence of special legislative authority a town can borrow money only for the discharge of those duties and liabilities imposed upon it by law.

2. The amount a town can so borrow is strictly limited to the amount necessary for such purpose.

3. The fact that a town officer or agent has borrowed money upon the credit of the town and expended it in the discharge of some town duty or liability does not bind the town to repay the money.

4. To render a town liable to repay money borrowed and expended for it, by any town officer or agent, the town must have previously authorized or subsequently ratified such borrowing by vote in legal town meeting upon a sufficient article in the warrant.

5. When a town officer or agent, authorized to borrow money for the town, has once borrowed the full amount authorized, his power to borrow ceases, and he cannot bind the town to repay any money thereafter borrowed by him under that vote.

6. If, pending the action of a town officer or agent under such a vote, other provision is made doing away with the need of such borrowing the power of such officer or agent falls.

7. A town treasurer, virtute officii, has no authority to borrow money upon the credit of the town for any purpose. He must be specially authorized by vote before he can bind the town.

8. A power and a vote to borrow money for one specific purpose will not sustain a loan to the agent for another and unauthorized municipal purpose even though the money so loaned was actually applied to such purpose.

9. If the town has the authority to borrow and by vote empowers its treasurer under that authority and the treasurer, acting within both the authority and the vote, does borrow and receive the money upon the credit of the town under such authority and vote,—the town is liable to the lender even though the money went not to its use but was embezzled by the treasurer.

10. A town without special legislative authority can borrow money to pay its lawful debts, and can arrange with its creditors for the payment, extension or renewal of such debts, and can evidence such arrangements by new notes or otherwise.

11. Upon the question of the existence of town debts, a report of the town treasurer of the amount of the debts of the town made to a legal town meeting and certified by the selectmen and auditor to be correct, and not questioned by the town, is prima facie evidence against the town of its then indebtedness to that extent.

12. In determining whether the debts or liabilities of a town are up to the constitutional limit of indebtedness, uncollected taxes, the town farm, and other property owned or held by the town cannot be deducted.

13. Where the vote of a town to borrow money does not specify that it is in anticipation of the collection of taxes already assessed and to be repaid out of them, the presumption is that it increases the town's debts or liabilities to that extent, and hence is within the constitutional prohibition.

14. Upon the question whether a town officer or agent had at any given date already exhausted his power to borrow, so that the town would not be liable for his subsequent borrowings, and also upon the question whether the town's indebtedness at any given date exceeded the constitutional limit, the burden of proof is on the town.

15. A list of notes in the handwriting of such officer or agent and purporting to be a list of notes outstanding against the town, is not competent evidence for the town in support of such burden of proof.

ON REPORT.

These were all actions upon promissory notes given by the treasurer of the defendant town and in its name, and all of the same general form. The note in the first action was in the following form:

"$300.                                    FOXCROFT, Feb. 15, 1883.

For value received, we, the inhabitants of the town of Foxcroft, by Elias J. Hale, treasurer thereof, duly authorized by vote of said town to hire money, promise to pay Hartwell Lovejoy, or order, three hundred dollars on demand and interest at four per cent. Payable at the treasurer's office in Foxcroft.

ELIAS J. HALE,

Treasurer of Foxcroft."

"(INDORSEMENTS.)

Foxcroft, Feb. 17th, 1887, rec'd four years' int.,            $48.00
Foxcroft, Feb. 27th, 1890, rec'd four years' int.,    ·        $36.00"

Plea, general issue. The defendants also filed a brief statement in which they set up the statute of limitations as a further defense.

The cases are stated in the opinion.

*Frank E. Guernsey,* for Lovejoy.

*A. M. Robinson, H. J. Cross; Frank E. Guernsey,* for Griffith and Gould.

*J. B. Peaks,* for Dunham and Emerson.

*W. E. Parsons and H. Hudson,* for defendant.

SITTING: EMERY, FOSTER, HASKELL, WHITEHOUSE, STROUT, SAVAGE, JJ.

EMERY, J. These are actions at law by which the several plaintiffs seek to recover judgments against the town of Foxcroft for money delivered to its treasurer, Elias J. Hale, at his instance, and supposed to have been thereby loaned to, and hired by the town itself. The character of some of the arguments for the plaintiffs impels us at the outset to again emphasize the often stated difference between a town and an individual, or corporation, in respect to its pecuniary duties and liabilities.

Towns in Maine, as in the other New England states, are territorial divisions into which the territory of the State is divided by the legislature for political purposes,—for the more convenient and effectual administration of certain functions of political government.

VOL. XCI. 24

The inhabitants of the particular territory are made a political agency, and particular duties and liabilities for purposes of administration are imposed upon them even without their consent. They are not a voluntary association. They cannot escape the duties and burdens imposed, except by a removal of themselves and their property from the town territory. It is clear that such agencies are subject to such duties and liabilities only as are expressly, or by necessary implication, imposed upon them by the legislature to effectuate the purpose of their creation. The powers of a town over the inhabitants and property within its territory are correspondingly limited to such as are necessary for the efficient discharge of those duties and liabilities;—and even these limited powers are to be exercised upon the citizen and his property only with such precautions and in such manner as may be prescribed by the State. Any effort to exercise any of these powers in any other way would be nugatory. The citizen, the tax-payer, can ignore any action or attempted action not strictly in accordance with the course prescribed. In the case of New England towns, especially, the interests and immunities of the citizen are and must be scrupulously guarded, since his private property can be taken upon a judgment against his town. Such a severe liability requires that the powers and proceedings of towns in New England, at least, should be construed with great strictness in his favor.

It follows that a town cannot assess or borrow money except for purposes strictly within the line of its duty. It can effectually act, even in such cases, only in legal town meeting, called, notified and held in the manner prescribed by law. The particular subject matter upon which action is called for must be distinctly specified in the notice. If any prescribed step is omitted, the inhabitants and hence the town itself are not bound by the result. Whoever deals with a town or its officers must bear in mind these bulwarks about the property of the inhabitants of the town, and make sure before hand, not only that the proposed contract is clearly within the legal powers of the town, but also that such power is exercised in the legal mode.

It should not now, after three-quarters of a century of statehood,

be necessary to cite statutes and decisions in support of the fore-
going statement of the nature of the duties and liabilities of a
town, and its consequent powers over the property of its citizens,
—but for various descriptions of them, see *Thorndike* v. *Camden*,
82 Maine, 39, and cases there cited; *Clark* v. *Tremont*, 83 Maine,
426; *Otis* v. *Stockton*, 76 Maine, 506; *Hurd* v. *St. Albans*, 81
Maine, 343; *Bessey* v. *Unity*, 65 Maine, 342; *Paine* v. *Boston*,
124 Mass. 486; *Carter* v. *Cambridge and Brookline Bridge Props.*,
104 Mass. 236; *Meriwether* v. *Garrett*, 102 U. S. 472; *Bloomfield*
v. *Charter Oak National Bank*, 121 U. S. 121; *Marsh* v. *Fulton*,
10 Wall. 676.

It must be apparent, after consideration of the cases cited and of
the other cases upon the subject, that a claim against a town can-
not be supported and enforced solely upon the general principles of
equity and good conscience applied to individuals and corporations.
A town is never estopped from invoking the defense of ultra vires.
*Syracuse Water Co.* v. *Syracuse*, 116 N. Y. 167.

The cases at bar, however, concern, chiefly if not solely, the
power of a town to borrow money, and how that power must be
exercised to bind the inhabitants of the town to answer therefor
out of their individual property.

That a town, in the absence of statute or constitutional restric-
tion, has power to borrow money for a legal town purpose and
within the limits of that purpose, without special statute authority,
is now conceded. If money is needed for the performance of a
town duty and the state has not commanded an assessment of taxes
for it, the majority of the inhabitants of a town acting in a legal
town meeting under a sufficient warrant can bind all the inhabit-
ants in determining to borrow part, and even all, of the money
rather than raise it at once from taxes. *Clark* v. *School District*,
3 R. I. 199; *Baileyville* v. *Lowell*, 20 Maine, 178; *Belfast Bank*
v. *Stockton*, 72 Maine, 522; *Brown* v. *Winterport*, 79 Maine, 305.
But this power of a town to borrow money is strictly limited to
money necessary for the discharge of its legal liabilities. It is
limited in amount as well as in purpose, and it must be exercised
by the town in town meeting upon proper warrant, and by vote

either authorizing the act of borrowing before hand, or afterward ratifying the prior act. It is not enough that the money was paid to some town officer and by him used in discharging some legal duty or liability of the town. A highway surveyor cannot borrow money, and expend it on the roads within his jurisdiction, and thereby bind the town to repay the money. There must be legal action in legal town meeting before the town becomes legally liable. Such is now the established law in this state. *Otis* v. *Stockton*, 76 Maine, 506; *Brown* v. *Winterport*, 79 Maine, 305; *Hurd* v. *St. Albans*, 81 Maine, 343. Such is also the law in Massachusetts whence we derived our town system. *Dickinson* v. *Conway*, 12 Allen, 487; *Railroad National Bank* v. *Lowell*, 109 Mass. 214; *Agawam Bank* v. *South Hadley*, 128 Mass. 503; *Brown* v. *Melrose*, 155 Mass. 587. See also *Bloomfield* v. *Charter Oak National Bank*, 121 U. S. 121.

The town treasurer is not the town's financial agent, and has no power whatever, as such, to bind the inhabitants of the town to repay money borrowed by him for the town and used by him in discharging liabilities of the town. He has no more power than a highway surveyor in this respect. He is unlike the cashier of a bank or the treasurer of a trading corporation. He is simply a public officer charged, by law not by the town, with the duty of receiving and guarding the public money and disbursing it upon lawful warrant. See cases last above cited and also *Abbott* v. *North Andover*, 145 Mass. 484.

When, however, a town has the power to borrow money, it may borrow through an agent appointed for that purpose, and may appoint its treasurer such agent. The treasurer's power in such cases is strictly limited, in the first instance to the power of the town, and in the second instance to the terms of the vote of the town meeting. A town cannot borrow upon the credit of its inhabitants more money than it actually needs for the specified purpose; and its agent, whether the treasurer or some other person, cannot borrow more money, nor for any other purpose, than is specified by the terms of the vote. When the need of the town is supplied, or the limit of the vote is reached, the power of the agent

is exhausted, and he cannot bind the town further. All persons proposing to loan money upon the credit of a town should make sure of the town's authority,— of its agent's authority,— and that the authority of each is still in force unexhausted and applicable to the proposed loan. A few cases will illustrate the strictness of this rule. In *Butterfield* v. *Melrose*, 6 Allen, 187, it was held that the treasurer, under a vote authorizing him to borrow money, could not bind the town to pay commissions to a broker. In *Lowell Savings Bank* v. *Winchester*, 8 Allen, 109, the treasurer was authorized by vote to borrow $2,000, and give the town's note therefor. He borrowed $2,000 of one party, and then took a certified copy of the vote to the bank, upon the strength of which the bank in good faith, without notice of the previous borrowing, loaned $2,000, as to the town and took the prescribed town note. *Held*, that the treasurer's authority had been exhausted and that the bank could not recover from the town. In *Benoit* v. *Conway*, 10 Allen, 528, the town voted that the treasurer "be authorized to borrow such sums of money as may be necessary for the adjustment of" a specified tax due the state. The tax was soon afterward adjusted by the town officers in another way, but notwithstanding such adjustment the treasurer subsequently borrowed money of the plaintiff as for the town under that vote. It did not appear that the plaintiff had any notice of the previous adjustment of the tax, yet it was held, that the need for borrowing having passed, the power to borrow had ceased, and that the act of the treasurer was not binding on the town. In *Abbott* v. *Andover*, 145 Mass. 484, the town voted that the treasurer "hire money for the use of the town." *Held*, that such a vote gave him no authority to give a new town note in renewal of an old one. In *Bessey* v. *Unity*, 65 Maine, 342, the town voted "to empower the agent to hire money to furnish men (at a fixed price) to fill quota" (the town's quota of men under a military conscription). *Held*, that it was incumbent upon the plaintiff, who had loaned money under that vote, to show what number of men was necessary to fill the quota, otherwise it could not be known whether the sum loaned was needed and within the power of the town and its agent to

borrow.   In *Benoit* v. *Conway*, supra, it was also held that the approval of the accounts of the town's financial agent by its municipal officers or committees did not bind the town.   The same was also held in *Porter* v. *Stanley*, 47 Maine, 518.

We have thus at length again stated the narrow limits of the power of a town and of its officers and agents to bind its inhabitants by any contract for borrowed money, and have again cited familiar illustrative cases.   We have done so in the hope that hereafter, at least, persons proposing to intrust their money to any town officer or agent upon the credit of the town will understand,— (1) that they cannot safely assume that the town, or its officer, has any authority to bind its inhabitants to repay the loan,— (2) that if such authority does not really exist,—still unexhausted and potent in the town and its agents unhampered by any statute or constitutional limitation, or is not exercised in the prescribed manner, or is not made good by subsequent authorized action of the town in town meeting, they cannot recover their money back from the town,—and (3) that in case of such improvidence upon their part, the court cannot weaken or bend the law to save them from the consequences of their improvidence.

On the other hand, the citizen of the town cannot safely rest supine.   There is imposed upon him the duty of watchfulness and discreet action in town affairs.   The town is not without freedom of action to bind its citizens within the narrow limits of its powers. Assuming the subject matter to be within the powers of the town and to be legally before the citizens in legal town meeting, the majority can bind the town and all its citizens by its action upon that subject matter within the limit of the town's power.   What of its legal power to exercise,— to what extent,—when and how to exercise it,—are questions for the town meeting to decide by majority vote, (except of course where the legislature has assumed to predetermine such questions.)

It may be lawfully voted, also, to refer more or less of such questions to the judgment and discretion of officers and agents, and to empower them to bind the town by their action in the premises. While the power of the agent can never exceed the power of the

town, however ample the vote appointing or empowering him may be, and while his acts must be within both the town's power and the town's vote, yet if his acts be within both, then the town and its citizens are bound by them however unwisely broad and liberal the vote. *Veazy* v. *Harmony*, 7 Maine, 91; *Ford* v. *Clough*, 8 Maine, 334; *Bean* v. *Jay*, 23 Maine, 117; *Vose* v. *Frankfort*, 64 Maine, 229; *Canton* v. *Smith*, 65 Maine, 203; *Woodcock* v. *Calais*, 66 Maine, 234; *Bucksport & Bangor R. R. Co.* v. *Buck*, 68 Maine, 81, 85; *Williard* v. *Newburyport*, 12 Pick. 227; *Friend* v. *Gilbert*, 108 Mass. 408; *Campbell* v. *Upton*, 113 Mass. 67; *West Bridgewater* v. *Wareham*, 138 Mass. 305.

When the money is once lawfully borrowed by the town under sufficient authority within any statute or constitutional limitation and has passed into the possession of the officer lawfully authorized to receive it, the lender is not affected by any subsequent misconduct of that agent, or any other town officer, nor by any subsequent mal-administration of town affairs.

The citizens of the town, not its creditors, have the duty of watchfulness over town affairs, town funds and town officers and agents. If they are remiss,—if they choose dishonest or incompetent officers,—if they omit to require ample guarantee,—if they accept their reports without examination,—and the funds lawfully borrowed or raised by taxation are embezzled or wasted, the loss must fall upon the inhabitants, and not upon the creditors of the town. So, if the inhabitants of a town become subject to burdensome liabilities by reason of the recklessness, or worse, of any town officer or agent acting within votes too broadly worded, or too confidingly passed, they should attribute the result to their own lack of wisdom and lack of attention to civic duty, and not to any harshness of the law.

We now come to the consideration of the transactions legally in evidence in the particular cases before us and of the legal rights and liabilities of the parties tested by the principles above stated.

Elias J. Hale, who borrowed the money and signed the notes as treasurer, was annually chosen treasurer of Foxcroft, from 1866 to

1894 inclusive, a period covering all the transactions of the several plaintiffs with him, or the town; and he acted as town treasurer during all that time. It does not appear that he took the qualifying oath of office, or that he gave any bond as such treasurer for many years at least, but that circumstance is immaterial in these cases. The town is not bound in these cases by any of his acts as treasurer virtute officii, but only so far as it lawfully and effectually constituted him its own agent. A vote making the town treasurer eo nomine an agent for any purpose means the actual incumbent of that office acting undisputedly colore officii. The town's neglect to insist upon the official oath and bond does not vacate the office or the agency.

It is not questioned that the annual and special town meetings held during that time were legal meetings, and that the various persons appearing to have acted as selectmen, auditors and committees of the town were such officers, at least de facto. No question is made as to their regular election and qualification.

Soon after Mr. Hale's first accession to the office of town treasurer and before any of the loans in these cases were made to him, the town in regular annual town meeting upon the following article in the warrant, viz:—

### "ART. 12.

To see if the town will authorize the Treasurer to obtain money by loan or otherwise, to pay the debts of the town, and to take up securities against the town, and issue new ones instead thereof, or to modify the same, and what conditions the town will prescribe in relation thereto,"

passed the following vote, viz:—

### "ART. 12.

Voted to authorize the treasurer to obtain money by loan or otherwise to pay the debts of the town, to take up securities against the town, and to issue new ones instead therefor, or to modify the same, and to obtain the money on the best terms that it can be procured."

This article and this vote were renewed in substantially the same language at each subsequent annual meeting and hence more or

less affect every loan.   It is not questioned that the article in the warrant was a sufficient basis for the vote, if the town had so much authority over the subject matter.

The scope and effect of this vote are to be considered.   If the town was in debt at each passage of the vote, and had not made sufficient provision otherwise, it had the power to empower an agent to borrow upon its credit, enough to provide for the debt. It could also arrange, through its agent, with its creditors with their consent for an extension of the debt, or its renewal, or for a substitution of new and even different evidences of indebtedness. *Gelpecke* v. *Dubuque,* 1 Wall. 221; *Little Rock* v. *Merchants National Bank,* 98 U. S. 308.   All this power was by this vote delegated to the appointed agent, the treasurer.   The town practically intrusted to him full discretion as to the management of the debt otherwise unprovided for.   He was authorized to obtain money for the debt,— by borrowing on such terms or with such other arrangement as he could make,— to take up such evidences of debt as had been before issued, and issue new ones in their place,— and to modify at his discretion any existing arrangement with any creditor.   Under this vote he could borrow to pay any existing debt, or he could continue the debt in such manner and on such terms as he could arrange with the creditor.

If, therefore, at the times of the respective borrowings named in these cases, the town was in debt more than it had made provision for, the treasurer had authority under this town vote to bind the town by such borrowing up to the amount of the debt left otherwise unprovided for.   That authority however would lessen and disappear as the debt was reduced and extinguished, and would also disappear with its own execution.   *Benoit* v. *Conway,* 10 Allen, 528, supra.   Whether such indebtedness of the town existed at the times of the borrowings is evidently the main question of fact in the cases under that vote.

At the annual meeting in 1865 a committee was appointed "to investigate the standing and report the liabilities of the town." This committee reported a loan indebtedness as of March 13, 1865, of over $25,000 and gave a list of notes, etc.   This report was

duly filed and remained on file. From that time down to 1894 inclusive the treasurer each year reported in writing the liabilities of the town to be of varying amounts but in no year less than $10,000. All these reports were certified by the auditor and selectmen to be correct, and their correctness does not seem to have been questioned by any inhabitant. Indeed, the report was usually accepted by vote of the town. Provision was usually made each year by taxation for a small proportion of the debt thus reported, but each year at least $10,000 were left unprovided for. These official reports and the official certificates of their correctness formally accepted and remaining so long unchallenged must be regarded as sufficient prima facie evidence against the town of the fact of its indebtedness each year unprovided for of at least $10,000. Against this conclusion the defendant cites *Porter* v. *Stanley*, 47 Maine, 518, and *Farmington* v. *Stanley*, 60 Maine, 476, holding that the official approval of the town treasurer's accounts by the selectmen does not bind the town. We do not here hold that it does. We only hold that facts recited above are evidence, and sufficient evidence prima facie, of the town's financial condition. It is open to the town to contradict that evidence.

The treasurer, therefore, had prima facie authority to borrow each year upon the credit of the town for the payment of debts, not less than $10,000. So far as the loans made by these plaintiffs come under that authority, the plaintiffs have shown a prima facie right of recovery from the town. The next step is to ascertain the status of the several loans.

I.   The Lovejoy case.

This plaintiff originally intrusted $300 to Mr. Hale as the borrowing agent of the town and upon the credit of the town, September 29, 1878, and received from Mr. Hale a town note therefor of the same date. Mr. Hale did not specify to the plaintiff for what particular purpose the money was borrowed, and hence it must be assumed that the plaintiff understood it to be borrowed under the record authority. This loan coming within that authority was prima facie binding on the town.

February 15, 1883, Mr. Hale took up this note and gave Mr. Lovejoy a new town note of that date for the same sum but at four per cent interest. Mr. Hale under the vote had authority to do this, and thus renew and extend the debt of the town to Mr. Lovejoy. It is urged by the town that the first note was paid, since the treasurer reported it paid in his account with the town. We are satisfied from all the evidence that the note was not paid, but simply renewed, under the authority given the treasurer to renew town obligations by new notes. *Atkinson* v. *Minot,* 75 Maine, 189.

The town, however, has pleaded the statute of limitations in bar of the note of 1883. To this plea, the plaintiff replies that payments of interest have been made and indorsed upon the note within six years. Such payments were made by the treasurer and by him indorsed upon the note, but were not charged to the town in his account. The town claims that such payments by its treasurer do not of themselves renew the note as against the town, since they were not made out of town funds. But the town owed the principal and interest and had the power to pay, renew, modify, or continue the obligation as it could arrange with its creditor. This power it delegated to its treasurer, empowering him to renew or re-arrange the terms of its obligation as he best could. He did renew by paying interest. That was enough for the plaintiff. He was not bound to see that the money came out of one cash drawer rather than another, or that the treasurer should afterward charge it in his accounts.

II.   The Griffith case.

The plaintiff's intestate intrusted $1030 to Mr. Hale as the borrowing agent of the town and upon the credit of the town June 28, 1887, and received the town note therefor of the same date. No special purpose was mentioned. Payments of interest were made by the treasurer and indorsed upon the note within six years. This note therefore is also prima facie binding upon the town, for the reasons stated in the Lovejoy case.

III.   The Dunham case.

This plaintiff, in the same manner as the above named plaintiffs, intrusted money to Mr. Hale, and received town notes from him in 1889, 1891 and 1892.   October 30, 1892, he surrendered these notes with some additional money to the treasurer and received a new town note therefor for $770 of the same date.   Again on November 18, 1892, he intrusted in the same way $200 more to the treasurer and received a town note for that.   No special purpose was mentioned for either of these loans, and, as in the Lovejoy case, it must be assumed that the plaintiff loaned upon the faith of the record.   These notes are therefore prima facie valid against the town.

Later, February 9, 1893, the plaintiff again loaned to Mr. Hale for the town $200 and received a town note therefor of the same date.   This sum however was borrowed and loaned specifically "for school purposes."   It was so stated and understood at the time.   The validity of this note, therefore, depends upon the authority of the town or its treasurer to borrow money "for school purposes."   We can find in the record no such authority.   The town does not appear to have needed to borrow money for schools, as it raised money by taxation for them, and nowhere does it appear that the town ever voted to authorize the treasurer to borrow for that purpose, or that it ever in any town meeting ratified such borrowing.

Applying the principles stated at length in the early part of this opinion, the plaintiff has failed to show even a prima facie obligation upon the town to pay this latter note.   Whatever the power of the town in the premises, a vote to empower an agent to borrow money for the specific purpose of obtaining money to pay town debts cannot be stretched to include borrowing money for current expenses for which the town had made provision by taxation.   The plaintiff was apprised for what purpose and under what authority the treasurer was assuming to borrow his money.   He loaned it for that purpose, and upon the strength of that supposed power.   That purpose and power proving to be non-existent, the plaintiff

cannot now as against the town invoke another purpose and power which were then ignored.

IV.　The Gould case.

In January, 1869, a Mrs. Harriman intrusted to Mr. Hale, as a loan to the town $800, and received a town note therefor on long time at seven per cent interest.　It was understood between them that this money was borrowed for the purpose of the town aiding in the construction of the Bangor and Piscataquis Railroad.　The town was authorized by the legislature to aid in that construction, and once in 1867, and again in 1868 effectually voted to so aid by a subscription to the stock to the extent of at least $25,000,— and it made the subscription.　This bound the town to pay for the stock subscribed for.　The town further voted, upon proper warrant articles, to raise the necessary money by loan, and also voted that the treasurer be authorized " to obtain the above amount . . . . for the above purpose, by loan on a time or times not exceeding twenty years, the treasurer to issue notes therefor . . . . as he deems best."　It was under this authority and vote that Mrs. Harriman's money was borrowed.　The town thereby became prima facie lawfully bound to Mrs. Harriman.

This note was surrendered April 25, 1874, and a new note issued to her by Mr. Hale as treasurer on fifteen years time for the same amount but at a less rate of interest.　For reasons already stated this new note was lawfully issued and it renewed or extended the town's indebtedness to Mrs. Harriman.　This last note was then transferred to the plaintiff Mrs. Gould, who at its maturity April 25, 1889, surrendered it and received a new note of that date at a still lower rate of interest.　On this last note, which is the note declared on, interest was annually paid by the treasurer up to 1894.　The original loan was prima facie binding on the town, and its various renewals and extensions were within the purview of the town's annual vote.

V.　The Emerson case.

This plaintiff, as in the other cases, loaned $200 June 1, 1893, and received the town note therefor, like the others.　This transac-

tion falls within the class of those covered by the annual vote upon the matter of the town debt, and is prima facie an obligation upon the town.

The plaintiff previously in October, and in November, 1889, intrusted $500 and $300 to the treasurer as a loan to the town and received town notes therefor. It was understood, however, by the plaintiff and the treasurer at both times that the money was being hired for the specific purpose of building a common road. Hence these notes do not come within the vote as to debts. They rest on the authority to borrow money for the building the road.

Votes were passed instructing the treasurer to borrow money for that purpose; but, waiving the question of the extent of such votes, the defense now claims that the town itself did not possess the necessary power, and hence that no action of the treasurer, or of the plaintiff, under those votes could bind the town. The constitutional limitation of municipal indebtedness is invoked against any such power in the town. As to this limitation, it appears that the gross indebtedness of the town exceeded the five per cent limit at the time of this borrowing for the road, but the plaintiff contends that from the gross indebtedness should be deducted the uncollected taxes, the town poor-farm, the state bonds held by the town, and other things usually denominated "town assets" and that after this is done, the indebtedness will appear to be considerably within the limit. The constitutional prohibition however, is very sweeping. It prohibits the creation of "any debt or liability, which singly, or in the aggregate with previous debts or liabilities, shall exceed five per centum of the last regular valuation," etc. There is no suggestion in it that anything, uncollected taxes, or town farms, or anything else, may be subtracted from the debts or liabilities. A debt is that which one is bound to pay to another. That the debtor has means with which to pay makes him none the less a debtor until he has paid. Liabilities are the antithesis of assets, and a prohibition against the creation of "any liability" does not imply that liabilities may be created up to the amount of the assets. Again it must be remembered that much of the property and revenues of a town are merely held in trust for the public and are subject to

the control of the legislature. For these reasons, as well as upon authority, it must be held that, inasmuch as the full aggregate of debts and liabilities of the town exceeded the five per cent limit, it had no power to create a debt or liability for the money borrowed to build a road. *Council Bluffs* v. *Stewart*, 51 Iowa, 385; *Baltimore* v. *Gill*, 31 Md. 375; *Law* v. *People*, 87 Ill. 626; *Doon Township* v. *Cummins*, 142 U. S. 366; *Waxahachie* v. *Brown*, 67 Tex. 519; *Appeal of City of Erie*, 91 Pa. St. 398.

The plaintiff again contends that the money was borrowed as a "temporary loan to be paid out of money raised by taxation during the year," and so within the exception in the constitutional prohibition. The first vote was in these words,—"Voted that the treasurer be authorized to hire money not to exceed $1000 to build said road." The second vote was, "Voted that the treasurer be authorized to hire such sums of money as he may deem necessary to complete said road." There is nothing in these votes indicating that the money borrowed under them was to be so paid. On the contrary the article in the warrant upon that subject was passed over without action. There seems to be no way in which the plaintiff can avoid the constitutional barrier against her claim for these loans. Even the gateway of the town's implied liability to refund her money paid into its treasury is closed against her. *Litchfield* v. *Ballou*, 114 U. S. 190.

The defendant, however, opposes to all the claims of each plaintiff two contentions not heretofore noticed in this opinion but which should now be considered.

The first contention is, that through the whole period of these transactions, from the time of the first vote authorizing the treasurer to borrow money to pay town debts, the debts and liabilities of the town exceeded the five per cent limit fixed by the constitution. But in the first and each recurring vote, authorizing the treasurer to borrow money to pay town debts, was a provision for "a loan for the purpose of renewing existing loans," and hence was within the exception in the article of the constitution limiting municipal indebtedness. That article explicitly excepted such loans, or debts, or liabilities. However much the loans to a town

exceeded the five per cent limit on January 2, 1878, when the constitutional limitation took effect, the town was not thereby obliged to tax itself to pay any of them off at once or even at maturity. It could under the proviso continue them along by making new loans for the purpose of renewing them. This process could be continued so long as the town adjudged it desirable. *Opinion of the Justices*, 81 Maine, 602.

Foxcroft was already largely indebted for loans when the constitutional limitation took effect. Though money was appropriated from time to time to reduce this indebtedness, yet for some reason the reduction was in fact small and new loans were constantly required to meet the old loans. The particular loans herein adjudged to be prima facie valid obligations of the town, prima facie appear to be loans made in renewal of existing loans and hence within the constitutional proviso. Whatever may be the fact as to other loans, it has not been shown in these cases that when these loans were made the constitutional proviso could not apply. What can be shown when other loans, if any, are sought to be recovered remains to be seen.

The second contention is, that at the time of each of the various borrowings under the annually recurring vote, authorizing the treasurer to borrow money to pay town debts, the treasurer had already borrowed as much as the vote authorized or could authorize, and hence his authority was exhausted, and the town was not bound by his further borrowings, including the money loaned by these plaintiffs. In considering this contention the preliminary question is, which party has the burden of proof? Must the plaintiff affirmatively prove that the treasurer's authority to borrow was not exhausted, or must the defendant affirmatively prove that it was? The burden is clearly upon the defendant. To hold otherwise is to require the plaintiff to affirmatively prove a negative proposition, and in this case a proposition practically impossible of affirmative proof, the treasurer being dead and his official reports not showing any excess of borrowing at those specific times. The very statement of the question suggests the answer we have given. There is no need of further reasoning. No authority is cited

against it.   If authority in support is desired it can be found in *Parker* v. *Supervisors of Saratoga County*, 106 N. Y. 392, (pp. 420, 421,) where the same question arose and the same answer was given.   As a corollary of this proposition, so far as the existence of debts to the full amount allowed by the constitution is relied upon as a bar, the burden is upon the town to show such debts, and not upon the plaintiff to show their non-existence.

The remaining question is, whether the evidence in the case sustains this burden of proof thus shown to be upon the defendant town.   The counsel for the town at the oral argument frankly admitted, what is true, that the record contained no sufficient evidence in support of their proposition unless the contents of a certain small book in the handwriting of the deceased treasurer, Hale, which book (the original) was exhibited to and left with the court.

The written entries or memoranda of a deceased third person, to be admissible as evidence of matters therein stated, must appear to have been made,— contemporaneously,— in the line of the writer's duty, and as a register of passing events made as they occurred,— the writer being regarded in this respect as a mechanical and self-forgetting registrar.   If the entries ·or memoranda appear to have been made merely for the private purposes of the writer, like a list of assets or liabilities, or written merely to preserve his recollection or views of past matters, they are not admissible.   Wharton on Evidence, §§ 238, 243, and numerous cases there cited.

The entries in the book before us clearly fall within the latter category, and are not to be regarded as evidence.   The heading on the first page of entries is —" Outstanding notes against the town of Foxcroft March 11, 1867."   Under this heading begins a list of notes, with dates, names of payees, and amount.   The first date is July 14, 1854, some twelve years before Hale became treasurer and began to make entries.   On the tops of the following pages are the words "Town of Foxcroft" only.   The contents of the entire book are merely a list of notes, not a register of passing events.   There is no intimation that the notes were entered on this

list as they were issued. On the other hand, the ink and the handwriting clearly indicate that the list was made up at wide intervals, a large number of notes of different dates being often placed upon the list at the same time. Again the book was not and does not purport to be a town book, or a town treasurer's book. It was never exhibited to the town or any of its officers. It was a private book, which never came to the knowledge of the town or any one until after his death. The contents were his private memoranda made for his own purposes, and more or less after the event.

We have now considered and determined all the questions presented by the pleadings and the legal evidence before us, and necessary for our judgment.

At the argument, counsel upon both sides called our attention to alleged excessive over-borrowings and defalcations of Mr. Hale as treasurer, and we were reminded of the newspaper accounts, at the time of Mr. Hale's death, of his dealings with the town and the public in the matter of borrowing money. We have, however, as was our duty, ignored all such reports and statements and have based our judgment exclusively upon the legal evidence put into the cases submitted to us. If such over-borrowings and defalcations took place, or if facts existed taking the loans out of the constitutional proviso, they must be proved by legal evidence before the court can consider them in any case.

The judgments to be rendered under this opinion are obviously as follows:—

In the Lovejoy case.—*Defendants defaulted.*

In the Griffith case.—*Defendants defaulted.*

In the Dunham case.—*Defendants defaulted only for the amount of the two notes dated Oct. 30, 1892, and November 1892.*

In the Gould case.—*Defendants defaulted.*

In the Emerson case.—*Defendants defaulted only for the amount of the note dated June 1, 1893.*